PHILIPS ELECTRONICS N.V. *et al.*, Plaintiffs-Appellants, v. NEW HAMPSHIRE INSURANCE COMPANY *et al.*, Defendants-Appellees (National Union Fire Insurance Company of Pittsburgh, Defendant).

First District (5th Division)  Nos. 1—99—1130, 1—99—1175 cons.

Opinion filed March 31, 2000.

Sachnoff & Weaver, Ltd., of Chicago (Jeffrey Gilbert and Michael Rich-

man, of counsel), and Dickstein, Shapiro, Morin & Oshinsky, L.L.P., of New York, New York (Jerold Oshinsky, Robin Cohen, Elizabeth Sherwin, and David Mlodinoff, of counsel), for appellants.

Clausen Miller P.C., of Chicago (Gilbert Schroeder, Mark Wilson, Scott Schmookler, Edward Kay, and Barbara Michaelides, of counsel), for appellees.

JUSTICE HARTMAN delivered the opinion of the court:

Plaintiffs Philips Electronics N.V. and Philips Electronics North America Corporation, doing business as Advance Transformer Company (collectively Philips), brought suit against the defendant insurers from whom it had purchased fidelity insurance policies (collectively Fidelity Insurers). Philips alleged that the Fidelity Insurers breached the insurance contracts for failure to indemnify Philips for its claimed losses and for damages allegedly caused by the Fidelity Insurers' misconduct and fraud during its claims-handling process. The circuit court dismissed the counts alleging claims-handling misconduct on *forum non conveniens* grounds; dismissed the count alleging the Fidelity Insurers' violation of Illinois' Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/1 *et seq.* (West 1996)) also on the grounds of *forum non conveniens*; and dismissed the counts alleging breach of insurance contract and fraud as barred by the doctrine of *res judicata.* Philips appeals[1] , raising as issues whether (1) the court erred in dismissing the breach of contract and fraud counts as barred by *res judicata*; and (2) the court abused its discretion in dismissing its claims-handling fraud and misconduct, and Consumer Fraud Act counts on *forum non conveniens* grounds.

Philips Electronics N.V. is a corporation organized and existing under the laws of the Netherlands with its principal place of business in Eindhoven, Netherlands. Its subsidiary, Philips Electronics North America Corporation (PENAC), is a corporation organized and existing under the laws of Delaware with its principal place of business in New York; PENAC does business in Illinois under the name Advance Transformer Company (Advance). Advance is based in Rosemont, Illinois, and manufactures electronic ballasts, triggering devices used for starting and regulating flourescent lamp fixtures.

Between December 31, 1993, and December 31, 1994, Philips was

---

[1]This is the third appeal taken in the instant action. See, *e.g., Philips Electronics, N.V. v. New Hampshire Insurance Co.*, 295 Ill. App. 3d 895, 692 N.E.2d 1268 (1998); *Philips Electronics v. National Union Fire Insurance Co.*, No. 1—98—2359 (October 22, 1999) (unpublished order under Supreme Court Rule 23).

insured by the Fidelity Insurers, a group of major foreign insurance companies, under "comprehensive crime" policies.[2] Those comprehensive crime policies indemnified Philips for losses resulting from fraudulent or dishonest acts committed by employees.[3] Philips was covered under a total of three policies: a primary, an excess and a deductible policy. The primary policy (and the excess policy, by incorporation) provided expressly for "United Kingdom," or English, law to govern the construction, meaning and interpretation of the policy terms; the deductible policy also provided for the application of "English" law.

All but two of the Fidelity Insurers operated in the London insurance market. Two insurers entered into the contract with Philips in the United States; the remaining 11 insurers entered into the contract in London, England. Most of the 13 insurers have limited ties to Illinois: only one is incorporated in Illinois; seven are incorporated in England; and the remainder are incorporated elsewhere in the United States, Italy or Belgium. The policies were negotiated in London between a Lloyd's of London broker, on behalf of Philips, and 11 of the Fidelity Insurers; the policies were entered into in London and were structured to give Philips a deductible of $2,780,000.

In late 1994, Philips notified the Fidelity Insurers (at their London office) of a planned claim for potential losses. On August 31, 1995, Philips submitted an 88-page "Proof of Loss" prepared "on behalf of [PENAC]" pursuant to policy requirements. Philips' Proof of Loss consisted of more than 200 exhibits and a lengthy narrative, detailing the nature of its claims. Those claims centered upon the alleged dishonest and illegal conduct of its employee Theodore Filson, president of Advance.

According to Philips' Proof of Loss, Filson, his wife and two other Advance employees and their wives formed a fraudulent travel agency,

---

[2]Philips was also insured by defendant National Union Fire Insurance Co., which issued a general liability policy. National Union Fire Insurance Co. was named as a defendant in Philips' complaint but is not involved in the instant appeal.

[3]The policies provided for coverage of "employee dishonesty" and indemnified Philips "following loss of Money, Securities and other property which the Insured sustains *** resulting directly from one or more fraudulent or dishonest acts committed by an Employee," provided that the employee possessed the "manifest intent: (a) to cause the Insured to sustain such loss; and (b) to obtain financial benefit for the Employee, or for any other person or organization intended by the Employee to receive such benefit, other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions, or other employee benefits earned in the normal course of employment."

using it to defraud Philips by dishonest overcharging. The Proof of Loss also described how Filson knew that the electronic ballasts' design contained an inherent flaw, yet he continued to sell and ship the defective ballasts in order to preserve or increase the appearance of Advance's performance. Filson's remuneration while president of Advance consisted of a salary, bonuses and an incentive plan; the amount of the bonus and incentive depended upon performance of Advance with regard to sales, income and inventory. In essence, the more ballasts that were sold, the more Filson would receive. As long as the ballast flaws remained undetected, Filson would retain his position, earn his bonuses and continue to embezzle money through the fraudulent travel agency scheme. The Proof of Loss therefore alleged that the shipment of defective ballasts was done, at least, with the dual purpose of maintaining the travel business fraud and of earning bonuses which Filson otherwise would not have earned. Philips terminated Filson and the other employees, but not before Filson had allowed shipment of the defective ballasts to Philips' customers.

As a result of Filson's dishonest conduct, Philips claimed losses of "at least $28,063,982." Specifically, Philips claimed $910,721.58 "embezzled by Filson *** through the fraudulent travel business" (the travel fraud); a $24,935,260.75 loss "resulting from the replacement of [the] defective product Filson fraudulently and dishonestly *** shipped into the market" (the defective ballast fraud); $218,000 in unearned bonuses paid to Filson (the bonus fraud); and "at least $2,000,000 in investigation fees." Additionally, Philips estimated its potential losses resulting from the replacement of defective parts to be "in excess of $100,000,000." Philips also reserved the right to amend or supplement the Proof of Loss as it continued to investigate its mounting losses.

Concerned that the allegation of Filson's deliberate placement of defective products into circulation on the market should not be made public, Philips further notified the Fidelity Insurers that *"[t]he information contained herein is confidential* and is not to be used *** for any other purpose. The release of this information to others without our express consent will be considered a breach of your fiduciary and contractual obligations under the policy." (Emphasis in original.) Accordingly, Philips urged upon the Fidelity Insurers the importance of keeping the Proof of Loss confidential and made it plain that it desired to resolve any dispute with the Fidelity Insurers by arbitration or some other form of alternative dispute resolution.

Negotiations between Philips and the Fidelity Insurers regarding coverage of claims began shortly after notice was given. To that end, in late 1994 and 1995, Philips' attorney, Patrick Ardis, met with the

Fidelity Insurers' independent claims adjuster, Edward Davies, in London and Illinois. As part of his investigation, Davies interviewed former and current employees of Advance and requested additional documentation from Philips. Philips provided substantial amounts of documents and information to assist Davies' investigation.

In September 1995, after learning that Davies intended to interview Filson and other former Advance employees, Ardis wrote to Davies, reminding him of the confidentiality of information contained in the Proof of Loss and requesting that Davies not provide copies of that document to the ex-employees or their counsel. Davies responded by informing Philips that he did "not consider it public dissemination to release the documents to the attorneys of the persons about whom allegations are made in the [Proof of Loss] for the purpose of giving these persons the opportunity to answer the allegations and then to judge the answers in the light of facts."[4] Accordingly, Davies confronted the former employees about Philips' allegations and showed the Proof of Loss to those former employees and their attorneys during his investigation.

On November 29, 1995, while Davies' investigation was on-going, the Fidelity Insurers initiated declaratory judgment proceedings against Philips, naming PENAC, in the Commercial Court of the High Court of Justice, Queen's Bench Division, in London, England (Commercial Court), seeking a declaration that they owed no duty to indemnify Philips under the policies for losses resulting from the bonus fraud, the defective ballast fraud, and investigation fees. Philips moved to dismiss the action on jurisdictional grounds, but its motion was denied.

In refusing to dismiss the Fidelity Insurers' claim, the Commercial Court found that the issues before it involved threshold issues of construction. Recognizing that the facts underlying Philips' claims of loss (the former employees' allegedly fraudulent and dishonest conduct) were largely centered in Illinois, the Commercial Court nonetheless determined that England was an appropriate forum in large part because the question before the court was one entirely of policy construction and was not fact-sensitive. In particular, the Commercial Court recognized that Philips, or PENAC, had submitted a detailed Proof of Loss, specifying the basis for its claim, which was presumed

---

[4]At this time, a lawsuit was pending in the federal court for the Northern District of Illinois filed by Philips against its former employees and their wives. That suit alleged claims for fraud and deceit, constructive fraud, conversion, theft and embezzlement, civil conspiracy, breach of fiduciary duty and aiding and abetting.

to be true for purposes of determining coverage. The Commercial Court further emphasized that it had provided Philips' attorney with the opportunity to "take [the Commercial Court] through the Proof of Loss to show [it] that by reason of perhaps inconsistent or alternative allegations of fact any attempt to resolve the matters of construction which [the Fidelity Insurers] put in issue would be doomed to failure or would likely prove difficult, but [Philips' attorney] declined the invitation." Thereafter, Philips sought interlocutory leave to appeal the Commercial Court's decision, which the English Court of Appeal granted on June 19, 1996.

On May 17, 1996, after the Commercial Court issued its opinion but before leave to appeal was allowed, Philips filed its original complaint in the circuit court of Cook County. Initially, Philips asserted that the Fidelity Insurers breached the insurance contract and breached their duty of good faith and fair dealing by providing former Advance employees with copies of its Proof of Loss, despite repeated requests to keep the information confidential, and by filing a peremptory claim against Philips in England. Philips further asserted a violation of the Illinois Insurance Code (215 ILCS 5/155 (West 1994)), alleging that Fidelity Insurers unreasonably refused to indemnify Philips for its losses.[5]

Contemporaneous with the circuit court case, the English action proceeded. On May 17, 1997, the English Court of Appeal affirmed the Commercial Court's refusal to dismiss. Recognizing Philips' Illinois complaint, the English Court of Appeal nonetheless found that England was the appropriate forum to determine issues of construction.[6]

---

[5]The Fidelity Insurers moved to dismiss the claims against them, arguing that the English action constituted "another action pending between the same parties for the same cause" and alternatively moved to stay the adjudication pending resolution of the English proceeding. The circuit court denied the motion to dismiss, but granted the motion to stay Philips' breach of contract and violation of the Insurance Code claims, pending resolution of the Commercial Court's coverage determination. Both Philips and the Fidelity Insurers appealed and this court affirmed, finding "it more appropriate for an English court to adjudicate the coverage claim and interpret its own laws." See *Philips Electronics*, 295 Ill. App. 3d at 908.

[6]In so finding, the English Court of Appeal stated:

"Here the declarations sought seek the resolution of preliminary points of construction on the basis of assumed facts. The English hearing may obviate the need for a trial of the facts, but it may not. And whereas England is the appropriate forum for determining the points of construction, Illinois is the appropriate jurisdiction for the trial of the facts."

Following the determination of the English Court of Appeal, the Fidelity Insurers' English declaratory judgment action again proceeded in the Commercial Court. There, the Fidelity Insurers accepted liability as to the claim involving $910,721.58 embezzled by Filson through the fraudulent travel business. Philips conceded that its claim for $2 million in investigation fees was not recoverable under the policies. Remaining, therefore, were claims regarding the defective ballast fraud and the bonus fraud, resulting in two main issues of construction in dispute: whether the claim for bonuses fraudulently obtained is excluded by the words "other than *** bonuses *** earned in the normal course of employment" contained in the policies and (2) whether the claims for bonuses and, more significantly, for the cost of replacing defective ballasts, are claims for "loss of Money, Securities, and other property" within the meaning of the policies.

As to Philips' first claim of loss, the bonus fraud, the Commercial Court found that, as a preliminary matter, Filson's bonus fraud resulted in a loss of "Money, Securities, and other property" as provided by the policies. The Commercial Court further determined that the fraudulent bonuses were not "earned in the normal course of employment" and therefore were not excluded by the policies. The Commercial Court held, therefore, that the Fidelity Insurers were "not entitled to a declaration that on the assumed facts they are not liable under section 1 of the policy in respect of the bonus fraud. Whether they are liable or not will be a matter for the jury in Illinois, unless of course the claim is settled."

As to Philips' second claim of loss, the defective ballast fraud, the Commercial Court determined that Filson's shipment of the defective ballasts did not constitute a "loss of Money, Securities and other property" within the meaning of the policies. The Commercial Court further found the question of Filson's "manifest intent" to be "irrelevant" in light of its determination that the defective ballast fraud did not result in property "loss" as contemplated by the policies. Accordingly, the Commercial Court held "[o]n the assumed facts [the defective ballast fraud claim] fails because there was no loss of relevant property under the policy. Subject to further argument it appears *** that the insurers are entitled to an appropriate declaration to reflect that conclusion. The same is not true of [the bonus fraud claim], which [Philips] is entitled to pursue on the assumed facts." Judgment was entered on July 2, 1998, in favor of the Fidelity Insurers declaring that the Fidelity Insurers had no liability under the policies to indemnify Philips for the ballast fraud claim.

Sometime after the Commercial Court's declaratory judgment, Philips filed a third amended complaint, containing six counts against the Fidelity Insurers, in the circuit court of Cook County, raising the same allegations regarding the defective ballast fraud as in its prior complaints, namely, that the Fidelity Insurers' policies covered the losses Philips incurred in replacing the defective ballasts shipped by Filson. Count I of Philips' third amended complaint therefore again alleged that the Fidelity Insurers breached the insurance contract by refusing to indemnify Philips for its ballast fraud claim; count IV again alleged a violation of the Illinois Insurance Code as a result of the Fidelity Insurers' failure to indemnify Philips.

Count V raised, for the first time in Philips' pleading, the Fidelity Insurers' violation of the Consumer Fraud Act, alleging that "in the course of their trade and/or commerce with [Philips], the Fidelity Policy Defendants engaged in deceptive acts and practices, such as intentionally making false and deceptive promises to" Philips regarding the disclosure of Philips' Proof of Loss.

In a similar vein, count II alleged the Fidelity Insurers' "fraud" in making false statements regarding the disclosure of the Proof of Loss, fraudulently inducing Philips to provide documents and in filing the English action "without adequately investigating [Philips'] claim or declining coverage." Count III alleged the Fidelity Insurers' "tortious breach of duty" in disclosing confidential policyholder information to the former employees.[7] Count VI alleged the Fidelity Insurers' "breach of separate confidentiality contract," claiming that the Fidelity Insurers breached their "partially oral" and "partially written" contract to protect Philips' confidentiality.

In response, the Fidelity Insurers moved to dismiss counts I through VI of Philips' third amended complaint. The Fidelity Insurers argued that the English judgment was *res judicata* as to Philips' coverage claims (counts I and IV); the claims handling misconduct counts (counts II, III and VI) should be dismissed in favor of transfer to England on *forum non conveniens* grounds; and the claim for violation of the Consumer Fraud Act (count V) failed to state a valid claim.

Philips countered that the English judgment was not *res judicata* because Philips had "a theory that [it] did not present [in England]

---

[7]In count III, Philips alleged that, as a result of the Fidelity Insurers' disclosure of the Proof of Loss, the former employees, including Filson, raised a defamation counterclaim in Philips' federal suit. Philips also alleged that "as a direct result of the Ex-Employees' counterclaims [it] incurred legal fees in contesting the Defamation Counterclaims; and [it] agreed to settle that action for far less than [it] otherwise would have received."

that [it does] want to present here" and that it had "a right to seek to recover in this case on the basis of theories, facts, and witnesses that were not presented in the English case." Philips further asserted that it "consciously avoided making [the English action its] entire case because [it] knew that [it was] in an incomplete proceeding." Notwithstanding Philips' new theory—"that there has been a diversion of corporate assets, time, and effort by the culpable persons" which constitutes a "loss" as defined by the policies—the circuit court determined that the declaratory judgment of the English Commercial Court was *res judicata* as to counts I and IV.

The circuit court further dismissed counts II, III and VI, which had alleged the mishandling of Philips' insurance claims and fraudulent disclosure of confidential information, on *forum non conveniens* grounds. In so ruling, the court weighed such factors as the respective availability of discovery in Illinois and England, the respective court dockets of Illinois and England, the situs of the cause of action, and the availability of compulsory process for the attendance of unwilling witnesses. Finding both England and Illinois to be appropriate forums for litigation, the court nevertheless determined that the majority of relevant witnesses were located in England, as opposed to Illinois. Accordingly, the court found this factor to weigh heavily in favor of dismissal on *forum non conveniens* grounds. After the court dismissed counts II, III and VI on *forum non conveniens* grounds, it heard argument on the Fidelity Insurers' motion to dismiss count V, the alleged violation of the Consumer Fraud Act, for failure to state a claim, which it denied, leaving pending before it the Consumer Fraud Act claim.

The circuit court thereafter noticed that it had essentially bifurcated substantially similar claims which were based on the same conduct, keeping one claim (count V) in Illinois and dismissing other claims (counts II, III, and VI) to be refiled in England. Recognizing the risk of parallel proceedings in England and Illinois, the court remarked that it "wasn't prepared to live with the fact that [it] was going to try the same issue over that [it] sent somewhere else for the convenience of it." Consequently, the court *sua sponte* raised the possibility of dismissing count V on *forum non conveniens* grounds. Despite their earlier position that the Consumer Fraud Act claim "remains here no matter what" and "would [not] be appropriately sent to England because it involves the pure interpretation of an Illinois statute," the Fidelity Insurers orally moved to dismiss count V, the Consumer Fraud Act claim, on *forum non conveniens* grounds. Following argument, the court granted the Fidelity Insurers' motion to dismiss count V on *forum non conveniens* grounds.

Philips timely appeals the circuit court's order dismissing, as barred by *res judicata*, counts I and IV of its third amended complaint. Philips timely sought, and was granted by this court, leave to appeal the circuit court's order dismissing counts II, III, V, and VI on *forum non conveniens* grounds. See 134 Ill. 2d R. 306.

## I

Philips first argues that the circuit court erred in determining that the judgment of the English Commercial Court was *res judicata* as to counts I and IV of its complaint, which had alleged breach of insurance contract and violation of the Illinois Insurance Code. Philips characterizes the English judgment as "artificially truncated" because the English court's determination was based on a set of "assumed" facts which Philips insists were incomplete somehow.

■ The doctrine of *res judicata* provides that a final judgment, rendered on the merits by a court of competent jurisdiction, constitutes an absolute bar to a subsequent action involving the same claim, demand or cause of action. *Village of Maywood Board of Fire & Police Commissioners v. Department of Human Rights*, 296 Ill. App. 3d 570, 578, 695 N.E.2d 873 (1998); *Airtite v. DPR Ltd. Partnership*, 265 Ill. App. 3d 214, 217, 638 N.E.2d 241 (1994). The essential elements of *res judicata* are: a final judgment on the merits rendered by a court of competent jurisdiction; an identity of causes of action; and an identity of parties or their privies. *People ex rel. Burris v. Progressive Land Developers, Inc.*, 151 Ill. 2d 285, 602 N.E.2d 820 (1992). *Res judicata* applies not only to those claims fully litigated in the first proceeding, but also to those issues that could have been raised or decided, but were not. *La Salle National Bank v. County Board of School Trustees*, 61 Ill. 2d 524, 337 N.E.2d 19 (1975) (*La Salle National Bank*). The issue of whether a subsequent claim is barred by *res judicata* is a question of law which this court reviews *de novo*. 735 ILCS 5/2—619(a)(4) (West 1996); *American National Bank & Trust Co. v. Village of Libertyville*, 269 Ill. App. 3d 400, 403, 645 N.E.2d 1013 (1995).

■ In the instant case, the parties do not dispute that the English and circuit court suits involve an identity of parties. They do disagree with respect to the existence of the other two factors, however. According to the Fidelity Insurers, the Commercial Court's declaratory judgment, determining the scope of insurance coverage as to the defective ballast fraud claim, operated as a final adjudication on the merits. The Fidelity Insurers point to this court's opinion in *Philips Electronics*, 295 Ill. App. 3d 895, claiming that this court "decided that the judgment of the English court would be enforceable against [Philips], precluding [it] from relitigating [its] coverage claims in [its] Illinois

action." In addition, the Fidelity Insurers contend that the Commercial Court's judgment was made upon Philips' own Proof of Loss, which Philips refused to amend.

Philips' countervailing argument is that the Commercial Court's judgment, determining the scope and coverage of the relevant insurance policies, is not *res judicata* as to its complaint in the circuit court, because that action was severely truncated having involved a limited and incomplete set of facts. In particular, Philips maintains that the English judgment, rendered upon only those facts contained in Philips' Proof of Loss, did not resolve the dispute or address the actual merits of the controversy.

The initial inquiry in determining applicability of *res judicata* involves whether the declaratory judgment of the Commercial Court was final as to the merits. Notwithstanding Philips' assertion, a review of that judgment reveals that it thoroughly analyzed the policy language and its application to the set of facts contained in the Proof of Loss. Philips presents no new facts not otherwise before the Commercial Court; rather, it argues only that it had a new "theory" to present to the circuit court. Philips does not demonstrate that this new "theory" could not have been raised before the Commercial Court. Accordingly, the judgment of the Commercial Court, which assumed the truth of the facts contained in Philips' own Proof of Loss and determined coverage thereon, operates as *res judicata* as to the coverage claims in the circuit court. See *La Salle National Bank*, 61 Ill. 2d at 529-30.

Significantly, the Commercial Court provided Philips with the opportunity to "take [the court] through the Proof of Loss to show [the court] that by reason of perhaps inconsistent or alternative allegations of fact any attempt to resolve the matters of construction which [the Fidelity Insurers] put in issue would be doomed to failure or would likely prove difficult," which Philips declined. This led the Commercial Court to the conclusion that "all the parties and the interest of justice would *** be served by an earlier rather than later determination of those issues."

Alternatively, Philips argues that certain exceptions to the application of *res judicata* apply. In particular, Philips contends that the Fidelity Insurers have "acquiesced" in the splitting of claims; the English Commercial Court "expressly reserved" Philips' right to maintain the Illinois action; Philips was unable to rely on a certain theory because of the limitation of *subject matter jurisdiction* of the English court; and it would be "inequitable" to allow for an artificially truncated action to control. See Restatement (Second) of Judgments § 26(1) (1982); *Rein v. David A. Noyes & Co.*, 172 Ill. 2d 325, 341, 665

N.E.2d 1199 (1996). Nothing in the record, however, indicates that any of these exceptions apply to the present case.

The record is devoid of any proof that the Fidelity Insurers stipulated to, agreed with or acquiesced in Philips' filing of the circuit court suit. Indeed, the record is replete with references to the Fidelity Insurers' continued insistence that the English court's determination of **no** coverage indemnification controls any subsequent suit for indemnification. Only in the event that the English court found coverage would Philips' subsequent suit for coverage be litigated in another forum.

Likewise, the record does not support Philips' assertion that the English court "reserved" Philips' right to litigate the claim for insurance coverage in Illinois. A review of the English court's remarks makes evident that the court anticipated only in the event of a finding that coverage applied would a subsequent suit for indemnification be viable in Illinois.

Accordingly, we affirm the circuit court's dismissal of counts I and IV of Philips' third amended complaint. Those counts sought breach of contract damages from the Fidelity Insurers for their refusal to indemnify Philips for its defective ballast fraud claim. The Commercial Court has determined, on the same set of facts and circumstances, that the policy does not cover those "losses." That determination is *res judicata* with respect to counts I and IV.

## II

Philips next challenges the propriety of the circuit court's dismissal of counts II, III, V and VI on *forum non conveniens* grounds. Philips first asserts that count V, the Consumer Fraud Act claim, is strictly an Illinois action and cannot be heard in England. Philips also insists that the court failed to weigh properly the appropriate factors in determining whether to dismiss on *forum non conveniens* grounds and, therefore, its decision must be reversed as an abuse of discretion. The Fidelity Insurers respond that **all** the counts involving the alleged fraud and claims-handling misconduct, including the Consumer Fraud Act count, were appropriately dismissed because England is the more convenient forum for determination of the issues.

■ *Forum non conveniens* is an equitable doctrine under which principles of convenience and fairness are weighed in order to choose between two or more forums having jurisdiction. *Griffith v. Mitsubishi Aircraft International, Inc.*, 136 Ill. 2d 101, 554 N.E.2d 209 (1990). When ruling on a *forum non conveniens* motion, the circuit court must consider "private" interest factors affecting convenience of the litigants and "public" interest factors affecting administration of the courts. *Vinson v. Allstate*, 144 Ill. 2d 306, 579 N.E.2d 857 (1991). Rele-

vant private interest factors include accessibility of sources of proof, availability of witnesses, availability of compulsory service of process to compel the appearance of unwilling witnesses, costs of obtaining witnesses, viewing the premises in question if appropriate, convenience of the parties and "all other practical problems that make trial of a case easy, expeditious and inexpensive." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 91 L. Ed. 1055, 1062, 67 S. Ct. 839, 843 (1947); accord *Griffith*, 136 Ill. 2d at 106. Relevant public interest factors include "the administrative difficulties flowing from court congestion; 'a local interest in having localized controversies decided at home'; and the unfairness of burdening citizens in an unrelated forum with jury duty." *Bland v. Norfolk & Western Ry. Co.*, 116 Ill. 2d 217, 224, 506 N.E.2d 1291 (1987), quoting *Gulf Oil Corp.*, 330 U.S. at 509, 91 L. Ed. at 1063, 67 S. Ct. at 843. An additional public interest factor, when applicable, is the appropriateness of having the case heard in a forum familiar with the state law that governs the case. *Simantz v. Prime Motor Inns, Inc.*, 213 Ill. App. 3d 813, 573 N.E.2d 234 (1991). A further consideration is plaintiff's choice of forum, which rarely will be disturbed unless the private and public interest factors strongly weigh in favor of the alternate forum; however, less deference is given to a plaintiff's choice where the plaintiff is not a resident of the chosen forum. *Kwasniewski v. Schaid*, 153 Ill. 2d 550, 553, 607 N.E.2d 214 (1992). When plaintiff's choice of forum is entitled to less deference, however, the test remains whether the relevant factors, viewed in their totality, strongly favor transfer to the forum suggested by defendant. *Griffith*, 136 Ill. 2d at 108-09; *Elling v. State Farm Mutual Automobile Insurance Co.*, 291 Ill. App. 3d 311, 318, 683 N.E.2d 929 (1997) (*Elling*). No one factor is accorded central emphasis. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 249-50, 70 L. Ed. 2d 419, 432, 102 S. Ct. 252, 262-63 (1981) (*Piper*).

The circuit court is vested with broad discretion to determine whether a motion to dismiss for *forum non conveniens* should be granted. It is not the function of the reviewing court to substitute its own judgment nor to determine whether the court exercised its discretion wisely. *Elling*, 291 Ill. App. 3d at 317. A reviewing court determines whether the court abused its discretion, which can be found only when no reasonable person would take the view adopted by the circuit court. See, *e.g.*, *McClain v. Illinois Central Gulf R.R. Co.*, 121 Ill. 2d 278, 520 N.E.2d 368 (1988); *O'Connell v. City of Chicago*, 285 Ill. App. 3d 459, 463, 674 N.E.2d 105 (1996).

■ In the case *sub judice*, Philips first asserts that the Fidelity Insurers "delayed" bringing their motion to dismiss for *forum non conveniens* and seeks reversal "in light of prior orders entered in this

action." Philips does not invoke Rule 187 (134 Ill. 2d R. 187(a)), which requires the filing of a motion to dismiss on *forum non conveniens* grounds "not later than 90 days after the last day allowed for the filing of that party's answer." Instead, Philips asserts that the Fidelity Insurers have consistently attempted to avoid Illinois litigation and their most recent attempt is disingenuous, if not improper. A review of the facts, however, reveals that the Fidelity Insurers' *forum non conveniens* motion is appropriate, particularly in light of the fact that the English court has determined that coverage does not apply to Philips' defective ballast fraud claim. Without those claims, the nexus of litigation is no longer so strongly centered on Illinois. The remaining counts in Philips' complaint now focus on the alleged fraudulent conduct of the Fidelity Insurers, rather than Philips' former employees, in inducing Philips to rely on their false promises of confidentiality. Central to these remaining claims is the conduct of the Fidelity Insurers, arguably occurring primarily in London. Accordingly, it cannot be said that the Fidelity Insurers' motion to dismiss on *forum non conveniens* grounds was in any manner untimely or disingenuous.

■ Next, Philips contends that the circuit court erred in finding Illinois a *forum non conveniens* to adjudicate Philips' Consumer Fraud Act claim. Philips argues that its Consumer Fraud Act claim cannot be heard in England, citing *Roby v. Corporation of Lloyd's*, 996 F.2d 1353 (2nd Cir. 1993) (*Roby*), and *Allen v. Lloyd's of London*, No. 96cv522 (E.D. Va. 1996) (*Allen*), *reversed*, 94 F.3d 923 (4th Cir. 1996), because English "conflict of law" rules prohibit the English courts from applying foreign statutory law. Both *Roby* and *Allen* involved federal securities and RICO actions by American investors against English insurance syndicates. In *Roby*, the plaintiff investors contended that choice of law clauses contained in their agreements were unenforceable because, *inter alia,* English courts would not apply United States securities laws. Support for this position came from "the undisputed testimony of a British attorney [that] neither an English court nor an English arbitrator would apply the United States securities laws, because English conflict of law rules do not permit recognition of foreign tort or statutory law." See *Roby*, 996 F.2d at 1362. Notwithstanding the testimony before it that certain statutory securities claims might not be available in England, the *Roby* court held that "[i]t defies reason to suggest that a plaintiff may circumvent forum selection and arbitration clauses merely by stating claims under laws not recognized by the forum selected in the agreement." *Roby*, 996 F.2d at 1360. Finding the available remedies in England adequate, the court refused to negate contract clauses delineating the application of English law. *Roby*, 996 F.2d at 1365-66. The *Roby* court noted

that forum selection and choice of law clauses could not be circumvented merely because foreign law or procedure might be different or less favorable than that of the United States. *Roby*, 996 F.2d at 1363. Instead, the question is whether the application of the foreign law presents a danger that plaintiffs would be deprived of any remedy or treated unfairly. *Roby*, 996 F.2d at 1363. The *Roby* court therefore rejected the plaintiffs' argument because it found that they had ample remedies under English law and nothing suggested that the English courts were biased or unfair. *Roby*, 996 F.2d 1353; see also *Allen*, 94 F.3d at 929 ("We do not believe that enforcing the parties' forum selection and choice of law provisions in this case will subvert United States securities laws' policy of prohibiting *fraud*. British law not only prohibits fraud and misrepresentations as do the United States securities laws, but also affords [plaintiffs] adequate remedies in the United Kingdom." (Emphasis in original)).

Although the Fidelity Insurers dispute the statement made in the *Roby* case regarding English "Conflict of Law" rules, they nevertheless claim that, as illustrated by *Roby* and *Allen*, whether the English courts will refuse to adjudicate one statutory claim is immaterial so long as Philips is provided an adequate remedy in the English courts. See, *e.g.*, *Piper*, 454 U.S. at 254, 70 L. Ed. 2d at 435, 102 S. Ct. at 265 (a substantive difference in the law of the alternate forum would only be relevant where "the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all"). They therefore argue that, even if the English courts were unable to adjudicate Philips' Consumer Fraud Act claim due to "conflict of law" rules, England would still be an appropriate forum.

The question of the English courts' ability to adjudicate the Consumer Fraud Act court is not dispositive; instead the question is whether adjudication by the English courts presents a danger that Philips "will be deprived of any remedy or treated unfairly." See *Piper*, 454 U.S. at 255, 70 L. Ed. 2d at 435, 102 S. Ct. at 265. There is no question here that English courts are capable of adjudicating Philips' allegations of the Fidelity Insurers' fraud and misrepresentation. The only dispute concerns whether England is the more convenient forum. Although Philips contends that the factors relevant to a determination of the appropriateness of dismissal based on *forum non conveniens*, viewed in their totality, strongly favor its chosen forum, a review of the record proves otherwise.

In the present case, the circuit court evaluated the Fidelity Insurers' motion count by count, first considering whether Illinois or England was the more appropriate forum to adjudicate counts II, III, and VI. Only after weighing the relevant factors as they applied to

these counts, and after making its determination that these counts were more appropriately heard in England, did the court even begin to address the propriety of dismissing count V on *forum non conveniens* grounds. Neither Philips nor the Fidelity Insurers objected to this approach; nor did either party anticipate the problems involved in addressing the counts separately. As a result of this procedure, however, the court was left with the problematic solution of raising *sua sponte* a motion to dismiss based on *forum non conveniens* Philips' Illinois Consumer Fraud Act count. Despite its separate consideration of the causes of action, the court weighed all the factors, according no one factor central emphasis. Contrary to Philips' argument, the court did not focus primarily, and heavily, on only one factor—the location of witnesses—to reach its decision; rather, the record reflects that the court viewed all the factors in their totality, but found the location of the witnesses dispositive.

The circuit court determined that the majority of witnesses were English. Edward Davies, an independent loss adjuster, and Alasdair Lothian, the Fidelity Insurers' claims manager, were both present at meetings in London when the alleged promises of confidentiality were made to Patrick Ardis, Philips' American attorney. Lothian, as an employee of Fidelity Insurers, could be compelled to testify in Illinois; Davies, however, averred in an affidavit that he would not travel to Illinois to testify. The Fidelity insurers also showed that three other English residents were relevant witnesses. Although Philips responded that several American witnesses, including its lawyers and some of its former employees and their lawyers were relevant witnesses, several of those witnesses did not reside in Illinois.

Likewise, the Fidelity Insurers' alleged promises of confidentiality were made in England. Although, on at least one occasion, the alleged promise was made over the telephone to persons in Illinois, the actual "promise" was made by English parties. Further, the conduct that allegedly breached those promises occurred during Davies' investigation, which took place in England and Illinois. Given the accessibility of sources of proof, availability of witnesses, availability of compulsory service of process to compel the appearance of unwilling witnesses and costs of obtaining witnesses, it cannot be said that the circuit court abused its discretion.

A review of the public interest factors leads to the same conclusion. Certainly the construction, meaning and interpretation of the policy terms and language is governed by English law, as set forth in the policies. Policy construction is no longer at issue, however, and the claims remaining center upon common law principles of fraud, breach of oral contract and the Consumer Fraud Act. Although Illinois has a

"local interest" in adjudicating issues related to its own legislation, the Consumer Fraud Act, English courts are capable of adjudicating the other common law fraud causes of action. As to the other public factors, no evidence was presented strongly favoring dismissal: England was not shown to offer any more expeditious route to trial than Illinois; and it was not shown that it would be "unfair" to burden Illinois citizens with jury duty in the instant case.

Here, although Philips maintains that the circuit court's finding (that adjudication in England would best serve convenience and the ends of justice) was an abuse of discretion, a review of the record reveals otherwise. The court in the instant case heard lengthy and comprehensive arguments from all parties. Only after thoroughly reviewing the facts and weighing the various factors involved did the court make its determination. That determination cannot be said to have been an abuse of discretion.

Based upon the foregoing analysis, the judgment of the circuit court is affirmed.

Affirmed.

THEIS, P.J., and GREIMAN, J., concur.